# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00398-NYW

TODD R. SEWELL,

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Todd R. Sewell's ("Plaintiff" or "Mr. Sewell") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#13, dated April 24, 2019] [1] and the Order of Reassignment dated July 22, 2019 [#21], this civil action is before the undersigned Magistrate Judge for a decision on the merits. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

---

[1] In citing to the Administrative Record, the court refers to the Electronic Court Filing ("ECF") docket number using the convention [#___], and cites to the page number associated with the Record, found in the bottom right-hand corner of the page. For all other documents, the court cites to the ECF docket number and the page number assigned by the ECF system.

# LEGAL STANDARDS

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the claimant must prove he was disabled prior to his date last insured. *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "The claimant bears the burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of proof at step five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether substantial evidence supports the final decision and whether the Commissioner applied the correct legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (internal citation omitted); *accord Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

## ANALYSIS

### I.      Background

#### A.      Procedural History

On June 16, 2016, Plaintiff filed his application for DIB, alleging he became disabled on April 3, 2015 at 47 years-of-age.  [#11-6 at 268-69].[2]  On October 17, 2016, the Social Security Administration administratively denied Plaintiff's application.  [#11-3 at 85].  Mr. Sewell submitted a written request for a de novo hearing before an Administrative Law Judge (ALJ) on December 6, 2016.  [#11-4 at 134].  ALJ William Musseman ("the ALJ") began this hearing on

---

[2] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page.  For all other documents the court cites to the document and page number generated by the CM/ECF system.

March 22, 2017, but having received new medical evidence that same day, continued the hearing on September 27, 2017. *See* [#11-2 at 79-84, 60-78]. The ALJ subsequently rendered an unfavorable decision on December 19, 2017, which the claimant appealed. [#11-3 at 101]. The Appeals Council remanded the case to the SSA with an order to investigate certain matters further, and ALJ Musseman presided over a subsequent hearing on September 5, 2018. [#11-3 at 121, 11-2 at 41-59].

On November 9, 2018, the ALJ issued a decision denying Plaintiff's application for DIB. [#11-2 at 14]. Plaintiff again requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's November 9, 2018 decision the final decision of the Commissioner. [#11-5 at 46-48; #11-2 at 1-6].

### B. Evidence Before the ALJ

Plaintiff began work as an Intelligence Officer for the United States Air Force ("USAF") in October of 1986. *See* [#11-7 at 303]. His education includes four or more years of college; military technical schools for his career; fifteen or more graduate hours towards a master's degree; and occasional professional military education. [*Id*.]. Mr. Sewell stopped working on April 3, 2015 but remained active duty until the USAF recommended permanent retirement on May 4, 2016. [*Id*. at 2]. At the time of his September 5, 2018 hearing, Mr. Sewell was fifty-one years old. Mr. Sewell alleges he became disabled on April 3, 2015, at 47 years-of-age, due to pulmonary embolism with residuals of nocturnal hypoxia and dyspnea; depression; anxiety; psychogenic stutter; chronic sleep impairment; and chronic fatigue. *See* [#16-2 at 24]. Because Mr. Sewell's appeal focuses on his gait abnormalities and ability to ambulate; his fatigue; and his isolative tendencies, the following discussion focuses solely on those ailments.

### i. **Physical Impairments**

In April 2015, following a five-day hospitalization, Mr. Sewell was diagnosed with an acute pulmonary embolism, acute respiratory failure, hypoxia, and pneumonia. [#11-10 at 678]. Upon discharge, Mr. Sewell was prescribed Xarelto, an anticoagulant medication. [*Id.*]. The following month, Mr. Sewell was hospitalized for nearly two weeks related to diagnoses of choledocholithiasis, bilateral pulmonary embolisms, and acute respiratory failure. [#11-10 at 592]. Toward the end of his hospital stay, he was again prescribed Xarelto. [*Id.* at 579].

Beginning in June 2015, Mr. Sewell received treatment from Russell M. Lee, M.D. ("Dr. Lee") related to his pulmonary issues. *See* [#11-11 at 736]. On June 26, 2015, Dr. Lee noted that Mr. Sewell remained on Xarelto and "seem[ed] to be improving clinically." [*Id.* at 740]. In records from an August 17, 2015 visit from Mr. Sewell, Dr. Lee concluded that, in the context of the pulmonary embolism and improvement of the symptoms thereof, his patient was "able to return to work." [*Id.* at 742]. In October of 2015, Mr. Sewell was prescribed physical therapy to "evaluate and treat for back, hip and knee pain and for strengthening" due to "multiple pulmonary embolism, gout and recent high dose narcotic use resulting in muscle loss and weakness." [#12-12 at 2913]. An October 27, 2015 physical therapy evaluation noted "diffuse weakness and poor balance due to prolonged inactivity." [#11-19 at 1397]. Beginning November 10, 2015, Mr. Sewell's physical therapy referrals included instructions to address "generalized weakness, gait abnormalities (wide based, cautions gait) and low stamina." [#12-12 at 2884]. His physical therapy referrals consistently set a long-term goal of "[n]ormal gait without assistive device." [*Id.* at 2894, 2898, 2900, 2909, 2911, 2914].

Medical records indicate that Mr. Sewell sometimes ambulated with the assistance of a cane, while at other times he did not. For example, on December 18, 2015 Mr. Sewell's provider

observed that "[h]e … [was] ambulating without a cane," [#11-22 at 1697], but a March 2016 report noted that Mr. Sewell was ambulating with a cane [#11-21 at 1602-04]. A June 2016 report similarly observed that Mr. Sewell presented with a "gait abnormality …[c]autious gait with some imbalance and ongoing use of a cane or other assistive device." [#12-6 at 2427]. During that appointment, Mr. Sewell "request[ed] proof of prescription for a personal cane, which he has been using since September 2015." [*Id*. at 2425].

On June 28, 2016, Dr. Lee completed a "Pulmonary Residual Functional Capacity Questionnaire" ("PRFCQ") checklist form for Mr. Sewell. *See* [#11-23 at 1821-25]. Therein, Dr. Lee opined that Mr. Sewell was (a) able to walk less than one city block, (b) unable to perform even sedentary work, (c) barred from all postural activities, and (d) expected to be absent from work more than four times per month due to his combination of impairments and limitations. [*Id.*].

In October 2016, state agency consultant Michael Canham, M.D. ("Dr. Canham") completed a "Physical Residual Functional Capacity Assessment" ("PRFC") evaluation of Mr. Sewell. *See* [#11-3 at 94-98]. Based on his evaluation of Mr. Sewell's medical records, and in the context of exertional limitations, Dr. Canham opined that Mr. Sewell could: (a) occasionally lift and/or carry 20 pounds; (b) frequently lift and/or carry 10 pounds; (c) stand and/or walk "about 6 hours in an 8-hour workday"; and (d) sit for a total of "about 6 hours in an 8-hour workday." [*Id.* at 94]. However, Dr. Canham did not explain the foregoing exertional limitations, "how and why the evidence support[ed] [his] conclusions," or "[c]ite specific facts upon which [his] conclusions [we]re based." [*Id.*]. Dr. Canham also identified various postural and environmental limitations applicable to Mr. Sewell. In both instances, Dr. Canham offered explanations and the factual bases for his opinions. [*Id.* at 95 (postural limitations "[r]educed for knee pain; climbing reduced for

chronic anticoagulation" and environmental limitations "reduced for chronic anticoagulation; extreme temperatures and fumes, dusts, etc. reduced for asthma.")].

On September 27, 2017 Mr. Sewell testified:

"I still have to walk with a cane for long distances, just in case I get lightheaded or have to take a break. I also use my cane for my knees, but I … mainly [use a cane] because I get lightheaded and have to take a break.

[*Id*. at 68]. He further testified that a doctor had prescribed him a cane because "at the time, [he was] having problems standing … [he was] a fall risk at the time." [*Id*.] Mr. Sewell stated that he did not use a cane at home where he is familiar with the location of his furniture and handrails. [*Id*. at 69].

Mr. Sewell's October 2017 and August 2018 physicals at the USAF Academy ("USAFA") referenced a "normal" balance, gait, and stance, and released Mr. Sewell without limitations. [#12-20 at 3339, 3383-84]. Between December 2017 and August 2018, Mr. Sewell visited Evans Army Community Hospital for routine treatment visits with non-mental healthcare providers. Records from these visits indicated no mobility limitations, and the claimant consistently reported at these visits that he was not experiencing nausea, vomiting, back pain, light headedness, gait abnormality, generalized pain, fatigue, anxiety, or depression. The healthcare providers treating Mr. Sewell at these visits recorded his mood as "euthymic" and his affect "normal." The claimant was observed as "fully oriented" and without mobility limitations. *See* [#12-20].

On September 5, 2018, as to his physical ailments, Plaintiff testified that both his pulmonary embolism and his asthma had improved. [#11-2 at 48-49]. He also testified that his polyarthritic conditions caused pain throughout his entire body, with pain averaging four-out-of-ten, which prevented him from sitting and standing comfortably. [*Id*. at 49-51]. Mr. Sewell's attorney noted that Mr. Sewell was using his cane, and Mr. Sewell testified that he used it "for

movement … for short walks, long walks distances." [*Id.* at 50].  He testified that he used the cane to "rest upon," and described it as "a step up … from the walker [he] was using." [*Id.*]  Mr. Sewell testified that he rarely requires treatment for his asthma.

The record, as it relates to Mr. Sewell's physical ailments, frequently includes reference to Mr. Sewell experiencing some level of fatigue.  However, "fatigue" does not appear as a stand-alone diagnosis in the record.  Rather, it is attributed to two separate medical phenomena.  Some reports indicated "fatigue" relating to Mr. Sewell's pulmonary embolism and resulting surgery and medical care.  *See, e.g.* [#11-11 at 697, 769, 783; #11-19 at 1409; #11-21 at 1607; #11-23 at 1821].  Elsewhere in the record, Mr. Sewell's fatigue is attributed to insomnia and/or sleep impairment, which in turn were attributed to Mr. Sewell's ongoing PTSD and other mental health infirmities (discussed at greater length in the following subsection).  *See, e.g.*, [#11-11 at 764; #12-17 at 3060].  Mention of "fatigue" in the record often appears as Mr. Sewell's subjective complaint, and not a stand-alone medical infirmity.  *See, e.g.*, [#11-16 at 1126; #11-19 at 1471].  Fatigue is also frequently mentioned as the result of physical exertion during physical therapy sessions.  *See, e.g.*, [#11-15 at 1038, 1040, 1076].  The record shows that Mr. Sewell denied feeling shortness of breath and even denied fatigue altogether.  *See* [#12-20 at 3383-84, 3383].

## ii.  **Mental Impairments**

In February 2016, Mr. Sewell also began treatment for post-traumatic stress disorder, unspecified depression, and possible conversion disorder via individual therapy sessions with clinical psychologist Steven Galvan, Psy. D. ("Dr. Galvan").  *See* [#12-18; #12-19 at 3280].  Subsequently, in June 2016, USAF Medical Evaluation Board diagnosed Mr. Sewell with anxiety, unspecified depression, and chronic PTSD resulting from exposure to violence while deployed in Afghanistan.  *See* [#11-13 at 948].  Records from Dr. Galvan also state the doctor's

belief that Mr. Sewell's PTSD symptoms were exacerbated by the deaths of his parents. [*Id*. at 54].

In October 2016, state agency consultant Anne Naplin, Ph.D ("Dr. Naplin") completed a "Mental Residual Functional Capacity Assessment" ("MRFC") evaluation of Mr. Sewell. *See* [#11-3 at 94-98]. Dr. Naplin opined that, provided work did "not involve tasks of more than limited complexity and attention to detail, limitations of attendance and pace [would] not prevent [Mr. Sewell's] completion of a normal workday/workweek or significantly reduce pace." [#11-3 at 98]. Dr. Naplin also noted that Mr. Sewell "cannot work closely with supervisors or coworkers," but opined that he was able to "accept supervision and relate to coworkers if contact is not frequent or prolonged." [*Id.*].

Dr. Galvan continued to treat Mr. Sewell and noted the presence of "agitation," "insomnia," and "anxiety" as "warning signs" in his risk assessments. *See, e.g.*, [#12-19 at 3230, 3237, 3243, 3249, 3253, 3257, 3261, 3269, 3274, 3278, 3284, 3288, 3294, 3298, 3306, 3312, 3316]. Dr. Galvan occasionally noted the presence of "withdrawal from friends/family/society" as a "warning sign" in his risk assessments. *See* [*id*. at 3230, 3237, 3243, 3288, 3306; #12-20 at 3354, 3364]. Dr. Galvan also frequently discussed Mr. Sewell's "isolative tendencies." *See* [#12-19 at 3258, 3267; #12-20 at 3344, 3348-49, 3358, 3368]. Mr. Sewell consistently denied any suicidal or homicidal ideations. [#12-19 at 3230, 3237, 3243, 3248, 3250, 3256, 3260, 3268, 3273, 3277]. Mr. Sewell was able to travel to Nebraska for family vacation and visit his parents' graves, but experienced social difficulties with friends and family while on a subsequent vacation to Nebraska. [#12-19 at 3262, 3276]. Nonetheless, the record presents an overall trend toward steady improvement in the plaintiff's PTSD, anxiety, and depression. *See, e.g.*, [#12-18 at 3164 (on April 11, 2016, Dr. Galvan notes that Mr. Sewell "reports he is significantly depressed and is

significantly tearful during session today."); #12-19 at 3228 (on February 1, 2017, "[i]n regard to anxiety/PTSD . . . [Mr. Sewell] reports continued improvement, including irritability. In regard to depressive [symptoms] . . . [patient] states they have continued to improve."); #12-19 at 3247 (on February 1, 2017, Dr. Galvan notes that Mr. Sewell "reports he continues to do well."); #12-19 at 3267 (on May 11, 2017, Dr. Galvan notes that Mr. Sewell "reports he continues to do 'ok.'"); #12-19 at 3276 (on August 1, 2017, Dr. Galvan reports that Mr. Sewell has "made progress with" social discomfort but "is allowing himself to isolate more frequently." Dr. Galvan advises Mr. Sewell to "continue to push himself to be in social situations vs. isolation."); #12-19 at 3296 (on October 20, 2017, Dr. Galvan notes that Mr. Sewell "reports he continues to be 'ok.'"); #12-19 at 3287 (on November 15, 2017, Major Archer notes that, "[i]n regards to anxiety/PTSD . . . [patient] reports continued improvement. In regard to depressive [symptoms] . . . [patient] states they have continued to improve," and "[p]atient expresses some excitement over his daughter's baby."); #12-19 at 3292 (on November 17, 2017, Dr. Galvan notes that Mr. Sewell "reports he has been doing better," "reports he has been doing well," and "reports getting out of bed daily at an earlier time and "has made progress with increased activity and decreased sleeping/bedtime."); #12-19 at 3282 (on December 15, 2017, Dr. Galvan notes that Mr. Sewell "reports he continues to do better. He is getting out of bed around 10am each day and is working to be productive during the day.").

In a letter dated February 7, 2018, Dr. Galvan sought to "clarify perceived discrepancies between [his] evaluations of Mr. Sewell's functioning and impairment and [Dr. Galvan's] clinical progress notes." [#12-19 at 3280-81]. Ultimately, Dr. Galvan emphasized his opinion that Mr. Sewell was "not yet near a level of functioning that [Dr. Galvan] consider[ed] adaptive or healthy" and his clinical observation that Mr. Sewell "experiences both social and occupational impairment to a considerable degree." [*Id.*]. Subsequent psychotherapy session records continued to

document improvement by Mr. Sewell. *See, e.g.*, [#12-20 at 3352 (on May 8, 2018, nurse practitioner notes that Mr. Sewell "reports continued improvement" and explains that he has "recently bought a house," "has been adhering to a more regular sleep schedule, and has been helping with the grandbaby quite a bit."); #12-20 at 3353 (on May, 2018, nurse practitioner notes that Mr. Sewell was walking without the use of a case); #12-20 at 3344-45 (on July 10, 2018, Dr. Galvan notes that Mr. Sewell "reports he is doing 'o.k.'" and explains that he and his family have moved into a new house and it was "working out well," and reports that he was "providing care for his new grandchild," although it "has been somewhat challenging for him." Dr. Galvan also noted that Mr. Sewell was no longer walking with a cane.).

At his hearing in 2017, when asked about a typical day, Mr. Sewell stated that he usually goes to bed around 11:00 PM; wakes up around 11:00 AM or noon; and stays in bed until 4:00 PM or 5:00 PM. [#11-2 at 64-65]. Mr. Sewell attributed this to his depression, his desire to avoid spending time with other people, and his desire not to involve his family in his experiences with depression. [#11-2 at 64-65]. Mr. Sewell also testified that while visiting family in Nebraska, he mostly stayed in bed and in back rooms away from family. [#11-2 at 66].

In September 2018, Plaintiff again testified to his isolative tendencies. He explained that his PTSD was brought on by a traumatic incident that occurred while serving overseas in the military, and that his depression stemmed from the deaths of his two parents within five months of each other. [#11-2 at 45-46]. Plaintiff explained that he experienced insomnia, and that he did not like to leave his home to do things like grocery shopping and eating at restaurants because being in public made him uncomfortable. [#11-2 at 45-47 (Mr. Sewell testified that when he is in public his heart races and he "feel[s] like the walls are closing in," "[b]eing out in public makes [him] uncomfortable," and that he does not go out to eat at restaurants or shop for groceries.)].

### iii. **Vocational Expert Testimony**

During the September 5, 2018 hearing, the ALJ received testimony from vocational expert Dennis Duffin (the "vocational expert"). *See generally* [#11-2 at 52-59]. The vocational expert considered several hypothetical individuals proffered by the ALJ and the work they could perform based on certain limitations. [*Id.*] First, the ALJ posed the following hypothetical to the vocational expert:

> I'm going to give you some hypothetical situations. First hypothetical: assume an individual the same age, education, work background as the Claimant. In the first hypothetical assume a full range of light; non-exertionally, occasional bend, squat, kneel; occasional overhead; occasional push/pull; no unprotected heights; no moving machinery; no hazardous work areas; minimal dust, smoke, chemicals; no temperature extremes; no dealing with the general public; occasional dealing with coworkers; no complex tasks, defined as SVP 2 or less, further characterized as only simple, rote, repetitive tasks. Are there jobs compatible?

[#11-2 at 51-52]. After first clarifying with the ALJ that the hypothetical individual could briefly interact with the public as long as public interaction was not job dependent, the vocational expert responded in the affirmative. [#11-2 at 52]. Specifically, the vocational expert identified three jobs compatible for the hypothetical individual: housekeeper cleaner, cafeteria attendant, and power screwdriver operator. [#11-2 at 52-53]. The ALJ then asked the vocational expert whether the foregoing jobs "are performed in this region in the manner generally compatible with their description in the DOT?", to which the vocational expert again responded in the affirmative. [#11-2 at 53].

Second, the ALJ asked the vocational expert to consider the same hypothetical individual but with an exertional limitation to sedentary work. The vocational expert testified that the following jobs would be compatible in the second hypothetical: document specialist; lens-block gauger; and table workers. [*Id.* at 53-54]. The vocational expert qualified his testimony: no

competitive employment existed for the second hypothetical individual if such an individual was unable to appropriately interact with the general public, coworkers, and supervisors. [*Id.*].

Third, the vocational expert concluded that there would be no competitive employment for an individual who could walk without rest less than one block; sit for thirty minutes at a time; stand for thirty minutes; sit and stand/walk for a total of eight hours a day; and would need to take frequent unscheduled breaks. [*Id.* at 55-56]. Finally, the vocational expert concluded that there would be no competitive employment for an individual with a moderate limitation to making judgment on simple work-related decisions; limitations on understanding and remembering complex instructions; limitations carrying out complex instructions; and a marked impairment on interacting appropriately with others. [*Id.* at 56-58].

### C.    The ALJ's Decision

On November 9, 2018, the ALJ issued a decision finding Mr. Sewell not disabled under the act at step five because, "considering [Mr. Sewell's] age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mr. Sewell] can perform," including jobs as a housekeeper cleaner, cafeteria attendant, and power screwdriver operator. [#11-2 at 30-31].

The ALJ concluded that Mr. Sewell:

1. had met the insured status requirements through December 31, 2021, and had not engaged in substantial gainful activity since the alleged onset date;

2. had the severe impairments of: pulmonary embolism, asthma, depression, anxiety, post-traumatic stress disorder, chronic cervical myofascial pain syndrome/mild cervical spondylosis, thoracic myofascial pain syndrome, lumbar spondylosis, bilateral lesions of the ulnar nerves/idiopathic progressive neuropathy, and obesity;

3. had no impairment or combination of impairments that met or medically equaled a listing;

4. had the RFC to perform light work, subject to various limitations, and could not perform his past relevant work; and

5. had the ability to perform other jobs that existed in the national economy.

*Id*. at 15-32.  Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner.  *See* [*id.* at 1–5].  Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on February 13, 2019, *see* [#1], invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Mr. Sewell argues that the ALJ erred in (1) improperly assessing Mr. Sewell's physical and mental limitations, due in part to the improper weight the ALJ afforded to various evidence in the record, at step four; and (2) relying on the vocational expert's testimony that Mr. Sewell could perform representative jobs of housekeeper cleaner, cafeteria attendant, and power screwdriver operator without considering Occupational Information Network ("O*NET") as a source of employment data.  *See* [#16].  I review whether substantial evidence supports the ALJ's findings of fact and whether the ALJ applied the correct legal standards.  *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016).[3]

## II.    Step Four - The RFC Assessment

---

[3] To the extent Plaintiff intended to raise challenges not identified above, he has not sufficiently developed such issues for review by this court and has waived them.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) (explaining that it is not the court's role to craft arguments for litigants, especially when represented by able counsel).

Mr. Sewell argues that the ALJ erred at step four of the DIB inquiry when the ALJ failed to properly (a) impose limitations on standing/walking; (b) consider Mr. Sewell's symptoms of fatigue and isolation; and (c) weigh the evidence, including the medical source opinions and the Plaintiff's testimony.

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")). The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004). For the following reasons, I find that substantial evidence supports the ALJ's assessment of Mr. Sewell's RFC. I address Mr. Sewell's arguments to the contrary in turn.

### A. The ALJ's Decision to Omit Standing/Walking Limitations from the RFC

Mr. Sewell argues that the ALJ improperly failed to incorporate standing and/or walking limitations in formulating Mr. Sewell's RFC assessment. Here, the ALJ determined that Mr. Sewell retained the RFC to:

> perform a range of light work as defined in 20 CFR 404.1567(b) with the following limitations: can occasionally bend, squat, kneel, reach overhead, and push/pull; cannot have no [sic] exposure to unprotected heights, moving machinery, hazardous work areas, or temperature extremes; can have minimal exposure to dust, smoke, chemicals, etc.; able to occasionally deal with coworkers, but should not deal with the public (*i.e.*, he is able to briefly deal with the public, such as passing the hallway, it just cannot be job dependent interaction); and can perform tasks with a Specific Vocational Preparation (SVP) of 2 or less further characterized as being simple, rote, repetitive tasks.

[#11-2 at 21]. According to Mr. Sewell, substantial evidence does not support the ALJ's RFC assessment because the ALJ's "finding of an unlimited ability to stand/walk in a day lacks the support of the record as a whole." [#16 at 8]. Mr. Sewell also contends that the ALJ failed to appreciate contextual references in Mr. Sewell's medical record to "LTG" (or "long-term goals") where the records discuss "normal gait" as merely a long-term goal for Mr. Sewell. [#16 at 3].

In his decision, the ALJ concluded that the evidence provided no consistent indication of limitations in mobility balance, gait, or stance. [#11-2 at 24, 25]. The ALJ acknowledged that Mr. Sewell experienced mobility limitations at some point, but "also noted, however, that later treatment records consistently showed that Plaintiff had a normal gait and no limitations on his mobility." [#19 at 8 (citing [#11-2 at 25])]. Indeed, the ALJ cites to records from October 2017, March 2018, and August 2018, wherein the Plaintiff presented a normal gait with no assistive device and no mobility limitations. [#11-2 at 25 (citing [#12-20 at 3324-25, 3338-39, 3384-85])]. Thus, to the extent Mr. Sewell contends that the ALJ reached his conclusion based on a misunderstanding of the term "LTG" or the contents of the objective medical records, I respectfully disagree.

Relatedly, Mr. Sewell argues that the ALJ improperly failed to incorporate a standing/walking exertional limitation in his RFC because the ALJ inconsistently weighed the medical opinion of state agency consultant Dr. Canham. Because this argument is inextricably intertwined with Mr. Sewell's arguments related to the weight the ALJ afforded to various evidence in the record, I consider it in more depth in the following section.

### B. Weighing the Evidence in the Record

Plaintiff argues that the ALJ erred at step four by failing to properly weight the medical evidence in the record. According to Mr. Sewell, substantial evidence does not support the ALJ's RFC assessment because the ALJ failed to accord controlling weight to Drs. Lee and Galvan's treating source opinions, inconsistently weighed the opinion of Dr. Canham, and erred in assessing Plaintiff's subjective complaints and concerns regarding fatigue and isolation.[4] [#16]. Specifically, Mr. Sewell argues that the ALJ should have afforded more weight to Dr. Lee and Dr. Galvan's medical opinions, and less weight to the medical opinions of Drs. Canham and Naplin because the latter doctors "did not see the entire record," and "did not have an opportunity to review the longitudinal development and progression of illness, injury, and limitation." [#16 at 19]. I consider the ALJ's treatment of the medical source opinions in turn.

#### i. Treating Source Opinions

In assessing a claimant's RFC, the ALJ must address medical source opinions. *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015). The Social Security regulations afford a

---

[4] Though SSR 16-3p superseded SSR 96-7p and eliminated the term "credibility," SSR 16-3p offers the same guidelines for ALJs to use in assessing a claimant's subjective complaints of symptoms. *See* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). For this reason, the court will refer to this challenge as one speaking to Mr. Sewell's credibility. *See Watts v. Berryhill*, 705 Fed. Appx. 759, 763 n.4 (10th Cir. 2017). *See also Ritter v. Comm'r, SSA*, No. 18-cv-03156-NYW, 2019 WL 6838958 (D. Colo. Dec. 16, 2019).

treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant. The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions." (emphasis in original)). Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of a treating or examining source is in no way "dismissible," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

Even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6). *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted).

**Dr. Lee's opinion.** In a PRFCQ checklist form Dr. Lee completed for Mr. Sewell on June 28, 2016, *see* [#11-23 at 1821-25], Dr. Lee opined that Mr. Sewell was (a) able to walk less than one city block, (b) unable to perform even sedentary work, (c) barred from all postural activities, and (d) expected to be absent from work more than four times per month due to his combination of impairments and limitations. [*Id.*]. But, although Dr. Lee was one of Mr. Sewell's treating physicians, his opinion "received little weight" by the ALJ because "Dr. Lee's assessment was inconsistent with his treatment records, which included a statement that found [Mr. Sewell] able to return to work . . . and noted significant improvement in [Mr. Sewell's] respiratory conditions with treatment." [#11-2 at 27 (citing [#11-24])]. *See also* 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). I find no error here.

The ALJ also concluded that Dr. Lee's opinion was inconsistent with Mr. Sewell's testimony at the September 2018 hearing, wherein Mr. Sewell "reported that his embolism and asthma ha[d] improved and he rarely ha[d] to use his prescribed asthma treatment." [#11-2 at 22]. In other words, the ALJ concluded that Dr. Lee's 2016 opinion was inconsistent with the record as a whole—including other opinions by Dr. Lee and the claimant's own, more recent reports. *See* 20 C.F.R. § 404.1527(c)(4) (ALJ must consider whether opinion is consistent with the entire record).

Here, the court finds no error in the ALJ's weighing of Dr. Lee's opinions. To start, the court agrees with the ALJ's decision not to assign controlling weight to Dr. Lee's June 2016 PRFCQ because "[t]he ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). As discussed above, Dr. Lee noted on several occasions that Mr. Sewell was doing well on medication. And Mr. Sewell's subsequent physical exams and medical records between 2016 and 2018—notably, temporally closer to the ALJ's decision in 2018—reflected marked improvements in Mr. Sewell's symptoms.

Next, the court finds that the ALJ adequately explained his reasons for affording Dr. Lee's opinions little weight. "Medical evidence may be discounted if it is . . . inconsistent with other evidence." *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (internal quotation and citation omitted). And an ALJ may reasonably discount a treating physician's opinion if the opinion is inconsistent with reports made by the claimant. *See Pisciotta v. Astrue*, 500 F.3d at 1078-79 (10th Cir. 2007). As above, the ALJ highlighted the contrary and well-supported medical evidence that did not corroborate the severity of the restrictions Dr. Lee's opinion identifies. This is sufficient, because there is no requirement that the ALJ make a formulistic, factor-by-factor finding so long as the court can discern the specific, legitimate reason(s) for the ALJ's decision. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (holding that the ALJ's discussion of contrary, well-supported evidence provided a sufficient basis for giving a treating source opinion very little weight, as the absence of an explicit discussion of the "factors for the each of the medical opinions before him [did] not prevent th[e] court from according [the ALJ's] decision meaningful review."). In other words, I find that the ALJ appropriately noted the inconsistencies between Dr.

Lee's treatment notes, opinion, subsequent medical records, and Mr. Sewell's own reports. *See Barnhill-Stemley v. Colvin*, 607 Fed. Appx. 811, 814-15 (10th Cir. 2015) ("Discrepancies between a treating physician's very restrictive functional assessment and that physician's contemporaneous treatment notes are a legitimate factor for discounting a medical opinion." (citing *White v. Barnhart*, 287 F.3d 903, 907-08) (10th Cir. 2002)).

***Dr. Galvan's opinion.*** The ALJ also considered—but ultimately gave little weight to— three assessments of Mr. Sewell provided by his treating psychologist, Dr. Galvan. [#11-2 at 27]. Two of the three assessments were opinions from 2016, and the third assessment presented in the form of a letter dated February 7, 2018. In his RFC assessment, the ALJ afforded the first two "assessments limited weight due to their inconsistency with the outpatient mental health treatment records," and Mr. Sewell's self-reports to Dr. Galvan. [#11-2 at 27 (citing [#12-19])]. The ALJ also explained why he gave Dr. Galvan's February 7, 2018 letter little weight:

> Dr. Galvan did not provide a function-by-function analysis with regard to the claimant's ability to perform work-related activities. Additionally, Dr. Galvan did not support his conclusion with any sort of explanation as to what he meant by the statement that the claimant has "social and occupational impairment to a considerable degree." Therefore, Dr. Galvin's [sic] letter is vague and imprecise with respect to what the claimant is able or not able to do as it pertains to a residual functional capacity and he did not provide a formal medical assessment of the claimant's ability to perform work-related activities in [the February 7, 2018] letter.

[#11-2 at 27]. Importantly, pursuant to 20 C.F.R. § 404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, . . . the more weight [the ALJ] will give that opinion. The better an explanation a source provides for an opinion," the more weight should be afforded "that opinion." 20 C.F.R. § 404.1527(c)(3). The converse is also true. Accordingly, I find that the ALJ sufficiently explained his decision to accord little weight to Dr. Galvan's assessments.

## ii. State Agency Consultants' Medical Opinions

I also find no error in the weight afforded by the ALJ to the state agency consultants', Drs. Canham and Naplin, opinions. The ALJ, not the court, is responsible for resolving any inconsistencies between medical source opinions. *See Smith*, 821 F.3d at 1268; *Medina v. Berryhill*, No. 16-cv-01339-NYW, 2017 WL 1862279, at *7 (D. Colo. May 8, 2017) ("[A]lthough the ALJ discredited Dr. Osborne's opinion, this fact alone does not support Mr. Medina's argument that the ALJ was required to accept Dr. Connolly's severe restrictions, and the court concludes that the ALJ did not err by picking a middle ground without adopting either opinion.").

The ALJ afforded significant weight to the opinion of state agency medical consultant Dr. Canham, who did not examine or treat the Plaintiff but did review the objective medical evidence in the record and completed a physical RFC assessment of Mr. Sewell. Mr. Sewell argues that the ALJ erred in finding Mr. Sewell fit for light work by inconsistently weighing Dr. Canham's opinion.[5] [#16 at 5]. "While 'there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question,' 'an ALJ is not entitled to pick and choose through an uncontroverted medical opinion, taking only the parts that are favorable to a finding of nondisability.'" *Overton v. Astrue*, 2013 WL 950866

---

[5] Mr. Sewell also argues that the "ALJ conflated the limitation to six hours of standing/walking in an eight-hour day as permitting the full range of light work. The three occupations identified do not typically have standing/walking requirements of equal to or less than six hours in an eight-hour day," and contends that "[t]he ALJ's error in failing to take into account the limitation in standing/walking described by the State agency physician . . . is material – the vocational expert could not have reliably identified the occupations described in the record with a limitation to standing/walking six of eight hours." [#16 at 8]. Here, Mr. Sewell "seems to conflate the existence of substantial evidence to support the ALJ's RFC determination with the step [five] determination that there were jobs available in the regional and national economies that [Mr. Sewell] could perform within the limitations of the RFC." *See Dutcher v. Colvin*, 2014 WL 12782962, at *8-9 (D.N.M. Dec. 8, 2014). Mr. Sewell's challenge to the ALJ's step-five decision is discussed in more detail in Section III, *infra*.

(D. Colo. Mar. 11, 2013) (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1288, 1292 (10th Cir. 2012)

(quoting *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007))).

In reaching his decision, the ALJ gave great weight to the State agency physician's conclusions regarding Mr. Sewell's <u>exertional</u> limitations. [#11-2 at 27]. However, despite the State agency physician's opinion that Mr. Sewell was able to stand and/or walk for a total of 6 hours in an 8-hour workday, the ALJ did not incorporate that limitation into his RFC determination. *See* [*id*. at 22, 26]. Thus, Mr. Sewell argues that the ALJ erred in identifying work that would potentially require more standing/walking than six hours in an eight-hour day. [#16 at 9]. Plaintiff notes that the "ALJ found that [Mr.] Sewell retained the ability to perform light work as defined in [20 CFR § 404.1567(b)]," and adds that the regulation "does not limit the amount of standing as walking [sic] other than to describe the exertion as in excess of sedentary work with additional lifting/carrying limitations," and "does not define light work as limited to six hours in an eight-hour day." [#20 at 2]. Plaintiff argues that "the Commissioner does not square the residual functional capacity with the ALJ's finding of Dr. Canham's opinion and finding in the initial determination that [Mr.] Sewell could not stand/walk for more than about six hours in a workday." [#20 at 3].

Plaintiff's argument ignores the applicable definitions. Pursuant to 20 CFR § 404.1567(b), "light work":

> Involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 CFR § 404.1567(b). And according to Social Security Ruling 83-10, the exertional requirements of the "full range of light work" "requires standing or walking, off and on, for a total

of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." *See* SSR 83-10, 1983 WL 31251. Thus, even if not explicitly incorporated in the ALJ's RFC assessment of Mr. Sewell, by limiting Mr. Sewell to a range of "light work", the ALJ implicitly encompassed Dr. Canham's suggestion of "about six hours" of standing or walking in a workday. Accordingly, I find no error here.

Finally, I note that in assigning weight to Drs. Canham and Naplin's opinions, the ALJ "fully considered the claimant's updated treatment records, the amount of time that ha[d] passed since the State agency's opinions were given, and some of the claimant's allegations." [#11-2 at 26]. Indeed, the ALJ explained in his decision that he afforded "the opinions of the State Agency's [sic] exertional limitations great weight, but the non-exertional and mental limitations only partial weight subject to the modifications the updated evidence dictates are appropriate in this case especially with respect to the . . . mental limitations, which were not necessarily policy compliant since they did not clearly state the most the claimant was able to do from a mental standpoint." [#11-2 at 26]. For example, explaining the weight given to mental limitations, the ALJ noted Dr. Naplin's opinion that, while Mr. Sewell was unable to work closely with supervisors or coworkers, he was able to accept supervision and relate to coworkers if contact was neither frequent nor prolonged, [#11-2 at 25 (citing [#11-2 at 98])], and concluded that "[o]verall, the claimant appeared to display improvement and/or stabilization of his mental symptoms with his prescribed treatment," [*id.* at 24 (citing [#11-24; #12-18])]. Thus, the ALJ explained in detail the weight he afforded each of the medical opinions and the reasons for affording some opinions great, partial, or little weight.

For the foregoing reasons, I find that the ALJ properly weighed the medical source opinions before him. I turn now to Mr. Sewell's arguments related to references of fatigue and isolative tendencies in the record.

### C.     Plaintiff's Fatigue and Isolation

Mr. Sewell argues that the ALJ failed to credit Mr. Sewell's allegations of fatigue and isolative tendencies. The Commissioner counters that the ALJ discredited Plaintiff's subjective allegations of fatigue by noting that such complaints were disproportionate to the objective medical record, which demonstrated conservative treatment and improvement of Mr. Sewell's symptoms therefrom. [#19 at 14]. I respectfully agree with the Commissioner.

"Credibility determinations are peculiarly the province of the finder of fact' and the [court] will uphold such determinations, so long as they are supported by substantial evidence." *Ruh v. Colvin*, No. 13-cv-01255-PAB, 2015 WL 1517392, at *2 (D. Colo. Mar. 30, 2015) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). "Credibility determinations should not be conclusory, but instead 'closely and affirmatively linked' to evidence in the record." *Oliva v. Colvin*, No. 13-cv-02495-PAB, 2015 WL 5719645, at *7 (D. Colo. Sept. 30, 2015) (quoting *Kepler*, 68 F.3d at 391)). In addition to considering the objective medical evidence, an ALJ must also consider several other factors including the claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; aggravating and mitigating factors; any medication taken and its efficacy; other, non-medication treatment and measures used to alleviate pain; and any other factors that may bear on the claimant's functional limitations. *See* 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016); *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010).

***Fatigue.*** In Response, the Commissioner argues that, "while the record does contain treatment notes indicating that Plaintiff was using a cane or experienced fatigue shortly after his

April 2015 pulmonary embolism, the record also demonstrates that Plaintiff's condition improved." [#19 at 8].[6]  Upon review of the record, I agree with the Commissioner.

The ALJ acknowledged in his decision Mr. Sewell's complaints of fatigue.  But the ALJ also considered the objective medical records from routine treatment visits Mr. Sewell underwent with health providers between October 17, 2016 (the date of the state agency's initial disability determination) and November 2018.  In the relevant temporal context, the medical records objectively demonstrated no mobility limitations, full orientation, and normal motor strength, among other things.  [#11-2 at 25 (citing [#12-20])].  The ALJ also noted that Mr. Sewell "was able to travel to Nebraska for baptisms and family vacations," "reported that he had started playing video games again," said that he "had moved his family into a new house," and "reported that he had been providing care for his new grandchild." [#11-2 at 24 (citing [#12-19; #12-20])].  Ultimately, the ALJ concluded that the "objective medical record d[id] not support the degree of impairment alleged by the claimant." [#11-2 at 25].

In other words, the ALJ's RFC assessment contains a narrative discussion of (a) the pertinent medical evidence, (b) Plaintiff's hearing testimony, and (c) functional reports submitted by Plaintiff in support of his SSI application.  *See* [#11-2].  The ALJ then concluded that Plaintiff's statements and subjective complaints of fatigue were not fully consistent with the objective record; in so doing, the ALJ discussed Mr. Sewell's daily activities, the longitudinal record and improvements documented therein, and the efficacy of treatment in mitigating Mr. Sewell's symptoms.  Upon review of the record, I find that the ALJ adequately assessed Plaintiff's subjective complaints of fatigue and properly tailored the RFC to only those subjective complaints

---

[6] As discussed above, although the record frequently indicates Mr. Sewell's subjective complaints of fatigue, it does not indicate "fatigue" as a stand-alone diagnosis, but rather a symptom secondary to his other ongoing mental health issues.

borne out by the record. Thus, the ALJ affirmatively linked his determination to substantial evidence and the court declines to upset that determination. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (noting that an ALJ need not consider every factor in assessing a claimant's credibility because "common sense, not technical perfection, is our guide.").

***Isolation.*** Mr. Sewell further contends that the ALJ failed to adequately consider Mr. Sewell's "psychological urge to isolate and avoid." [#16 at 15]. However, beyond Mr. Sewell's assertion that the ALJ "fails to properly consider the complaints of … isolation," Mr. Sewell did little to develop that argument or clarify how Mr. Sewell's isolative tendencies were improperly reflected in the RFC. The ALJ reviewed the record and concluded that "the objective evidence does not indicate that [Mr. Sewell] has serious recurrent or ongoing problems interacting with others," and concluded at step three that Mr. Sewell experienced "moderate difficulties" in his "ability to interact with others." [#11-2 at 18, 21]. Accordingly, the ALJ's RFC incorporated restrictions on Mr. Sewell's limited ability to interact: "able to occasionally deal with coworkers, but should not deal with the public . . . *i.e.*, he is able to deal briefly with the public." *Id*. at 21 (internal parentheticals omitted). The ALJ expressly considered Mr. Sewell's isolative tendencies, determined the degree of resulting impairment based on objective medical evidence, and incorporated that level of impairment into his RFC determination.

My review of the record reveals no error. The ALJ correctly considered the entire record when making this decision, including all of Mr. Sewell's testimony and the longitudinal medical evidence developed between the date of Mr. Sewell's alleged onset of disability in 2015 and the ALJ's final determination in November 2018. I find that the ALJ reasonably relied on the evidence he based his decision on, including the discrepancies between Mr. Sewell's testimony and medical

records regarding his symptoms, Mr. Sewell's testimony regarding his daily activities, and the opinion evidence in the record. Accordingly, I find that there is substantial evidence in the record to support the ALJ's determination.

### III.     Step Five – Claimant's Ability to Perform Representative Work

Mr. Sewell next argues that the ALJ erred at step five of the DIB assessment. At step five of the sequential analysis "the burden of proof shifts to the Commissioner . . . to show that the claimant retains sufficient RFC to perform work in the national economy, given her age, education, and work experience." *Hackett*, 395 F.3d at 1171; 20 C.F.R. § 404.1520(a)(4)(v). This also requires the ALJ to consider any exertional and non-exertional limitations that may impede the claimant's ability to perform the identified work as well as any impacts those limits have on the number of jobs available in the national economy that the claimant is functionally capable of performing. SSR 83-14, 1983 WL 31254 (Jan. 1, 1983). When an ALJ relies on "expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the [DOT]." *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 2005); SSR 00-4p. It is the ALJ's responsibility to "elicit a reasonable explanation for any discrepancy on this point." *Hackett*, 395 F.3d at 1175.

Mr. Sewell challenges the ALJ's conclusion that Mr. Sewell could perform work as a power-screwdriver operator. [#16 at 20]. In reaching this conclusion, the ALJ solicited the testimony of the vocational expert, whom the ALJ directed to assume a limitation of no moving machinery. [#11-2 at 52-53]. The vocational expert further testified that this job was performed in the Colorado region "in the manner generally compatible with their description in the DOT." [*Id*. at 54]. However, the Selected Characteristics of Occupations ("SCO"), a companion to the

DOT, describes the position of power-screwdriver operator as having occasional proximity to moving mechanical parts. [#11-8 at 8]. Thus, this job description conflicts with the Plaintiff's RFC and the vocational expert did not clarify this discrepancy at hearing. *See* [#11-2 at 52-58]. In Response, the Commissioner does not challenge Mr. Sewell's argument regarding the impropriety of the ALJ's conclusion that Mr. Sewell could perform work as a power-screwdriver operator. *See* [#19 at 15]. Instead, the Commissioner contends that, "[e]ven if the Plaintiff is correct, the ALJ found that [Mr. Sewell] could perform two other jobs at step five." [*Id.* at 15 n.6]. Notwithstanding the inconsistency between the SCO job description for power-screwdriver operator and Mr. Sewell's RFC, the ALJ still found that Mr. Sewell could perform two other jobs. *See* [#11-2 at 32]. The applicable inquiry is whether <u>any</u> compatible jobs exist in significant numbers. *See Raymond v. Astrue*, 621 F.3d 1269, 1273-74 (10th Cir. 2009) (affirming the ALJ's decision even assuming that two of the three jobs relied upon by that ALJ were erroneous). Both housekeeper cleaner and cafeteria attendant jobs exist in significant numbers in Colorado and in the national economy. [#11-2 at 32].

Mr. Sewell also challenges the ALJ's conclusion that Mr. Sewell could perform work as a housekeeper cleaner or cafeteria attendant. [#16 at 20-23]. Plaintiff notes that although the DOT classifies both occupations as unskilled and simple, the O*NET describes these jobs as requiring significantly more contact with others. [*Id.* at 20-21; #11-8 at 47; #11-9 at 46]. Mr. Sewell argues that because the vocational expert's testimony relied on the DOT, and because the O*NET descriptions conflict with those of the DOT, the ALJ's conclusion rested on "feeble and contradicted" testimony on the part of the vocational expert. [#16 at 21-23].

Mr. Sewell is not the first plaintiff to challenge a disability determination on its failure to consider O*NET. *See, e.g., Moffitt v. Berryhill*, No. 17-4015-JWL, 2018 WL 276770, at *2 (D.

Kan. Jan. 3, 2018) (affirming Commissioner's final decision despite the plaintiff's argument that the O*NET should be preferred due to "the well-known fact that the . . . (DOT) is an obsolete and static database."); *Davis v. Comm'r of Soc. Sec.*, No. CIV-17-1093-SM, 2018 WL 2436411, at *4 (W.D. Okla. May 30, 2018) (affirming Commissioner's decision despite the plaintiff's argument that "the DOT is outdated and unreliable, and the O*NET . . . contain[s] updated and reliable information which should be used."). But as the Commissioner points out in Response, [#19 at 15], and another court in the Tenth Circuit found,

> the SSA has explained that "[i]n making disability determinations, we rely primarily on the DOT (including its companion publication, the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor]) for information about the requirements of work in the national economy," and that it also may use [vocational experts] "to resolve complex vocational issues." SSR 00-4p, 2000 WL 1898704, at *2. And, while SSR 00-4p and *Haddock* require an ALJ to investigate and elicit a reasonable explanation for any conflict between the DOT and the [vocational expert] testimony, they do not require the ALJ to resolve conflicts between [vocational expert] testimony and other vocational publications or information.

*Davis*, 2018 WL 2436411, at *4 (internal citations omitted). Whatever the merits of O*NET, the ALJ is simply not required to resolve any "discrepancies" between its contents and the vocational expert's testimony. Indeed, when an ALJ relies on expert vocational evidence as substantial evidence to support a determination of non-disability, "the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the [DOT]." *Haddock*, 196 F.3d at 1087 (emphasis added); SSR 00-4p. Because the ALJ's conclusions regarding Mr. Sewell's ability to perform cafeteria and housekeeping jobs were based on conclusions consistent with the DOT, I find no error in those conclusions.[7]

---

[7] Mr. Sewell also argues, in the first instance in his Reply, that a recent United States Supreme Court case supports the proposition that SSR 00-4p is no longer entitled to deference. [#20 at 5-6 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019))]. However, "the only 'question presented' in *Kisor* was whether the Supreme Court would overrule *Auer v. Robbins*, 519 U.S. 452 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) and discard the deference given to agency

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED: March 18, 2020                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge

---

interpretations of ambiguous regulations." *See Mitzi D. v. Saul*, 2019 WL 8112507, at *2 (C.D. Cal. Dec. 13, 2019) (considering—and finding unpersuasive—a similar challenge to SSR 83-10). And *Kisor* "'answer[ed] that question no,' affirming that '*Auer* deference retains an important role in construing agency regulations.' Rather than change the law, the Supreme Court 't[ook] the opportunity to restate, and somewhat expand upon those principals' that have governed *Auer* deference." *Mitzi*, 2019 WL 8112507, at *2. And Mr. Sewell has failed to persuade this court based on the briefing before it that SSR 00-4p has not been appropriately interpreted. Accordingly, I find Mr. Sewell's argument in this regard misplaced.